**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMAL WHITE, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:18-cv-00518-SRC |
| | ) | |
| CITY OF ST. LOUIS, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's

Complaint [93]. The Court grants the Motion.

## I.   BACKGROUND

On April 6, 2018, Plaintiff Jamal White filed a complaint in this Court alleging

Defendant Adam Feaman, a police officer with the St. Louis Metropolitan Police Department,

used excessive force against White in violation of the Fourth and Fourteenth Amendments of the

United States Constitution; White alleges Feaman struck White in his jaw and cranium with a

flashlight. White also named the City as a defendant but did not assert any counts against it.

White sought to voluntarily dismiss his Complaint against all defendants without prejudice. The

Court granted White's request, in part, and dismissed the City and Feaman in his official

capacity, without prejudice, but did not dismiss the claim against Feaman in his individual

capacity.

On February 26, 2019, White filed an amended complaint against Feaman, in his official

and individual capacities, the City, and Dan Isom,[1] in his official and individual capacities. In

---

[1] Plaintiff alleges that Dan Isom is both the Chief of Police and the current police commissioner for the City.

1

his Amended Complaint, White maintains his count of excessive force against Feaman in his individual capacity, and he adds counts against Feaman in his official capacity, and Isom and the City for failure to train and supervise in violation of the Fourth and Fourteenth Amendments. White brings his claims under 42 U.S.C. §1983 and asserts that the City has two policies and a custom that are the "moving force" behind the alleged unconstitutional conduct. He first alleges the two policies: (1) the "Normal" policy pursuant to which the City "normally" charges suspects on whom excessive force is used with resisting arrest in municipal court (rather than state court); and (2) the "Rec" policy under which municipal prosecutors will plea bargain and "recommend" dismissal of municipal-court-resisting-arrest-charges only if a defendant will sign a liability waiver releasing the City from any civil lawsuits. Doc. 62, ¶¶ 22-24. White then alleges St. Louis Metropolitan Police Department ("SLMPD") has a "custom" of "using unjustified force with impunity in any case that an offender runs, pulls away, or protest [sic]." Doc. 62, ¶ 55. White labels the "custom" as "you run, you pay" ("YRYP"). Doc. 99.

In their Motion to Dismiss, the City, Feaman, and Isom, in their official capacities only (collectively, "Municipal Defendants"), seek to dismiss the claims against them for failure to state a claim, and, for redundancy. Specifically, Municipal Defendants assert White fails to state a claim for municipal liability because Municipal Defendants' policy prohibits using flashlights as impact weapons, White fails to plausibly allege Feaman cracked White's jaw because of Municipal Defendants' alleged policies, that Municipal Defendants were deliberately indifferent to a widespread pattern of unconstitutional misconduct, and that Municipal Defendants failed to train its police officers. Municipal Defendants also argue White's official capacity claims under 42 U.S.C. § 1983 against Feaman and Isom are redundant of the claims against the City.

## II.    STANDARD

Under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The notice pleading standard of FRCP 8(a)(2) requires a plaintiff to give "a short and plain statement . . . showing that the pleader is entitled to relief." To meet this standard and to survive a FRCP 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872-73 (8th Cir. 2010).

When ruling on a motion to dismiss, a court must liberally construe a complaint in favor of the plaintiff. *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recovery on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79. "A pleading that merely pleads labels and conclusions or a formulaic recitation of the elements of a cause of action, or naked assertions devoid of factual enhancement will not suffice."

*Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010) (internal quotations omitted). Although courts must accept all factual allegations as true, they are not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677-78.

Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 679. Therefore, a court must determine if the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Id.* This "context-specific" task requires the court to "draw on its judicial experience and common sense." *Id.* at 679, 682. In determining the plausibility of a plaintiff's claim, *Iqbal* and *Twombly* instruct the Court to consider whether "obvious alternative explanations" exist for the allegedly unconstitutional conduct. *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567. The Court must then determine whether the plaintiff plausibly alleges a violation of the law. *Id.* The well-pleaded facts must permit more than the "mere possibility of misconduct." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

## III.    ALLEGATIONS IN THE COMPLAINT

Under *Iqbal*, the Court must parse out the factual allegations that it must accept as true and the conclusory allegations it can disregard. Here, the Court summarizes all of White's allegations, factual and conclusory, to provide context to the Court's analysis below.

White alleges, that on August 14, 2016, Feaman, a patrol officer, sought to place White under arrest. A citizen bystander recorded the arrest on video. White states he did not have a firearm on his person and did not present a physical threat to Feaman. As White moved backward from Feaman, White questioned his impending arrest. Feaman became so enraged,

White alleges, he struck White with his flashlight, cracking White's jaw. White collapsed to the ground and Feaman yelled "get on the mother f*ckin the [sic] ground." Feaman then hovered over White, taunted him again, saying "Get on the mother f*cking the [sic] ground!" and struck White in the cranium. According to White, as a result of Feaman's actions, White required extensive medical care, sustained significant injuries, and suffered severe emotional and psychological distress.

White alleges that although Feaman falsely claimed he was in fear for his life to justify his use of force against White, Feaman charged White in municipal court because he was not actually in fear and knew deadly force was not authorized. Prosecutors at the municipal court "aggressively" attempted to persuade White's defense counsel to sign a release of civil liability in exchange for dismissing the charges against White. White refused to sign the release and was "forced to withstand trial." White alleges on September 30, 2017, Feaman discovered that White was seeking to file a lawsuit. Feaman located White in a local establishment and identified himself as a sworn police officer. Feaman threatened to "crack [White's] jaw again" until he was escorted out of the establishment.

White alleges the excessive force Feaman used against him was the result of a widespread custom in the SLMPD of "you run, you pay" that was caused by the "Rec & Normal" policies. According to White, the "Rec & Normal" policies were created in 2012, when the SLMPD Chief of Police updated a special order and trained officers to "normally" charge any resisting arrest charge in municipal court rather than state court when the offender did not use force or threaten to use force, i.e. the "Normal" policy.[2] White alleges the City also enforced

---

[2] White alleges that "Rec" and "Normal" are both official policies (Doc. 62, ¶¶ 22 and 23) but then refers to them as "practices and policies" (e.g. Doc. 62 at ¶ 24). For purposes of the Motion to Dismiss, the Court assumes that, to the extent White alleges that "Rec" and "Normal" are "practices," he sufficiently alleges they constitute a custom or usage with the force of law and analyzes them accordingly.

a mandatory policy, called the "Rec Policy." In exchange for a city prosecutor's recommendation to dismiss a charge for resisting arrest in municipal court, the defendant signs a release of any civil liability that the City may have for use of excessive force against the defendant.

The written "Normal" policy states, in part:

Under normal circumstances, the defendant will be charged with a city ordinance violation of resisting arrest or interfering with an officer. The information application will be made at the City Counselor's Office.

The written "Rec" policy states, in part:

Resisting arrest & Interfering [sic] with a Police Officer charges <u>cannot</u> be amended without first obtaining a signed release from the defendant (See Sample).

White alleges the Rec & Normal policies directly and indirectly motivate SLMPD officers to use excessive force or make false arrests with the protection of the City's municipal court. White claims this shield, "whether or not individually known to each SLMPD officer, was embedded in SLMPD training policies and practices."

According to White, prosecutors escorted unrepresented defendants into the hallway and explained that the prosecutor will dismiss or amend the charge if the defendants sign a blank form titled "Release." Generally, the prosecutors complete the remaining lines of the form and defendants "have only seconds to decide to release his/her rights or face up to 90 days in jail." Without legal representation, many of the accused, according to White, "were pressured and forced to sign the release in exchange for their freedom, even when they were innocent of the facts."

White alleges he has not found a single case where a release agreement was legally enforced against a plaintiff in federal court. The release was created for its "psychological and marketing effects that resulted and continue to cause censorship and prior restraints on accused

victims . . . to petition the courts for redress of civil rights violations . . . Prosecutors and legal practitioners have been aware of the psychological effects of release agreements since 1987."

White alleges SLMPD learned of the release policy because executed release agreements were regularly sent to the SLMPD once completed. The release form specifically states the releasor agrees not to sue the SLMPD for injuries sustained during his/her arrest. White claims that *but for* the blanket policy, the SLMPD could have investigated the underlying facts precipitating the need for a release. Instead, the facts were ignored and the case considered closed because the SLMPD had an executed release agreement from the accused victim.

White alleges the Rec & Normal policies caused and concealed a widespread pattern of civil rights abuses throughout the City that began with unlawful searches or excessive-use-of-force incidents and then escalated to illegal arrests and unjustified deadly force. White alleges regardless of whether an individual presents a physical threat, if the individual runs, protests, or walks away from an officer, the officer will use excessive to deadly force as his/her primary means of detaining the individual. Therefore, White alleges the Rec & Normal policies have established widespread systematic patterns of unlawful arrests and searches as retaliation for recording or protesting an officer's misconduct.

White "defines SLMPD's widespread police misconduct as tyrannical practices" including the "use of excessive and unjustified deadly force when the accused victim runs, pulls away, or protests[,]" and "unlawful arrests to search and destroy evidence." The Complaint lists 16 examples of SLMPD pattern cases between 2013 through the present. White alleges by 2018, the alleged pattern and practices were so pervasive and widespread that SLMPD officers beat an undercover officer and claimed the officer resisted arrest. According to White, the common

denominator in all of these cases is that the accused victim allegedly pulled away, ran, protested, or walked away, *i.e.*, resisted arrest.

## IV. DISCUSSION

In the Motion to Dismiss, Municipal Defendants argue White's Complaint fails to state a claim for municipal liability. Specifically, Municipal Defendants claim White fails to plausibly allege that Feaman cracked White's jaw *because of* the release policy, that the City was deliberately indifferent to a widespread pattern of unconstitutional misconduct, or that the City failed to train its officers on the use of excessive force. Municipal Defendants also state White's putative municipal liability claim fails because the City's policy prohibits the use of flashlights as impact weapons. Finally, Municipal Defendants assert White's § 1983 claims against Feaman and Isom in their official capacities are redundant of the municipal liability claims against the City.

### A. Municipal Liability

Section 1983 of Title 42 allows individuals to bring causes of action for violations of the U.S. Constitution. The section states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. A municipality can be sued under § 1983 for an officer's misconduct where the misconduct is alleged to have implemented or executed a policy, ordinance, regulation, decision, or custom of the municipality. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality cannot be held liable under § 1983 on a *respondeat superior* theory. *Id.* at 691. When a plaintiff sues an officer in his/her official capacity, it "generally represent[s]

only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166.

In *Monell*, and subsequent cases, the Supreme Court "require[s] a plaintiff seeking to impose liability on a municipality under §1983 to identify a municipal 'policy' or 'custom' that *caused* the plaintiff's injury." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694, *Pembaur v. Cincinnati*, 475 U.S. 469, 480-81 (1986), *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)) (emphasis added).

A plaintiff cannot establish liability by only identifying conduct properly attributable to the municipality; instead, a "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the '*moving force*' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate *a direct causal link* between the municipal action and the deprivation of federal rights." *Id.* at 404 (emphasis added). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, *rigorous standards of culpability and causation must be applied* to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405 (emphasis added); *see also Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 947 (8th Cir. 2017) ("The Supreme Court has set a high bar for establishing municipal liability under § 1983.").

Here, White alleges both "policies" and a "custom" – the "Rec & Normal" policies, and the YRYP custom. Doc. 62. Different analytical frameworks apply to municipal policies and customs. *Brown*, 520 U.S. at 404; *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). As the Eighth Circuit explained in *Mettler*, "a 'policy' is an official policy, a deliberate choice of

a guiding principle or procedure made by the municipal official who has final authority regarding such matters." 165 F.3d at 1204 (citing *Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998)). In contrast, a "custom" is a "practice [that] is so widespread as to have the force of law." *Brown*, 520 U.S. at 404. The Court discusses these different analytical frameworks below, in the context of the applicable pleading standards for policies and customs. First, the Court will discuss the applicable pleading standard and then apply that standard to White's Complaint.

### 1. Municipal Liability Pleading Standard under *Iqbal* and *Twombly*

Under the *Iqbal*/*Twombly* standard, a plaintiff must plead facts plausibly showing that the alleged policy or custom subjects the municipality to liability under *Monell*, *Canton*, and their progeny. *Iqbal*, 556 U.S. at 678-680. While courts recognize several different "policy" claims under §1983, White only alleges an "official policy" claim. *Szalba v. Brooklyn Park, Minn.*, 486 F.3d 385, 390 (8th Cir. 2007) (finding a municipality may be liable for an unconstitutional written policy, as in *Monell*, or when a plaintiff establishes a "policy" by "demonstrating that the inadequacies were a product of deliberate or conscious choice by policymakers"); Doc. 62, ¶¶ 22, 23. The elements of an "official policy" claim are: A deprivation of a plaintiff's constitutional rights that results from the municipality's official policy. It is not enough for plaintiff to show that the municipality employed a person who violated the plaintiff's rights. Plaintiff must show that the violation resulted from the municipality's official policy. 3rd Cir. Model Jury Instr. 4.6.3.

The elements of a "custom" claim are: "(1) existence of a continuing, widespread, persistent pattern of unconstitutional misconduct" by the municipality's employees; "(2) deliberate indifference to or tacit authorization of such conduct" by the municipality's officials

after notice of the misconduct; and (3) the pattern of misconduct was the "moving force" behind the plaintiff's injury. *Mettler*, 165 F.3d at 1204.

## 2. Application of the *Iqbal/Twombly* pleading standards to White's Complaint

As noted, White alleges that the combination of the Rec & Normal policies and the YRYP custom caused a deprivation of his constitutional rights. The Court must analyze the "official policy" claim and the "custom" claim separately. *Mettler*, 165 F.3d at 1204. The Court also must analyze the two separate causal links White alleges: (1) that the Rec & Normal policies caused the custom of YRYP, and (2) that the YRYP custom caused Feaman to in-fact use excessive force on White. Doc. 62. The Court must apply "rigorous standards of culpability and causation" to these separate causal links. *Brown*, 520 U.S. at 405.

Before analyzing the specific elements of White's claims, *Iqbal* instructs the Court to first identify the allegations in the Complaint not entitled to the assumption of truth, then to assume the veracity of the well-pleaded factual allegations, and finally, to determine if they plausibly give rise to an entitlement to relief. 556 U.S. at 679.

### a. Conclusory Allegations

*Iqbal* instructs courts to begin the motion-to-dismiss analysis by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 556 U.S. at 679. In its analysis, the Court reviewed every allegation in White's Complaint to identify those that are "no more than conclusions" and those that are well-pleaded factual allegations.

Consistent with *Iqbal*, the Court does not state here *every* conclusory allegation in the 23-page complaint, instead giving the following as representative of the conclusions the Court does not assume as true: (1) "The Rec & Normal practices and policies caused and concealed a widespread pattern of civil rights abuses throughout the City"; (2) "Together the Rec & Normal

11

practices and policies directly and indirectly motivated SLMPD officers to use excessive force or make false arrests with the protection of the City municipal courts"; and (3) "Today, the Rec & Normal policies and practices have established a tyrannical culture by the SLMPD throughout the City." Doc. 62, ¶¶ 24, 26, 27. These, and other allegations, lack "sufficient factual matter," and because they are no more than conclusions, they "are not entitled to the assumption of truth. *Iqbal,* 566 U.S. at 678, 679.

### b. Well-Pleaded Factual Allegations

Under *Iqbal*, the Court next assumes the veracity of White's well-pleaded factual allegations. 556 U.S. at 679. *Iqbal*, likewise, does not require the Court to state here every well-pleaded factual allegation in the lengthy complaint; the Court accordingly gives these examples of White's well-pleaded factual allegations that the Court assumes as true: In 2012, the City and the SLMPD created, and enforced, the Rec & Normal policies. The SLMPD trained officers to charge any resisting arrest in municipal court when the offender did not use force or threaten to use force. In enforcing the Rec & Normal policies, prosecutors escort unrepresented defendants into the hallway of municipal court and explain the charge will be dismissed or amended if the accused signs the release form. Executed release agreements were regularly sent to SLMPD, which then considered the case closed and did not investigate allegations of police-officer misconduct. On August 14, 2016, in the process of attempting to place White under arrest, Feaman struck White with his flashlight, cracking White's jaw and striking White in his cranium. White refused to sign the release agreement and stood trial on resisting arrest charges. White required extensive medical care, sustained injuries, and suffered emotional and psychological distress. After Feaman discovered White was seeking to file a lawsuit against him, Feaman located White in a local establishment and threatened to "crack [White's] jaw again."

### c.  Plausibility of White's Claim to Relief

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but has not shown – that the pleader is entitled to relief." *Id*.  "That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably." *Brown*, 520 U.S. at 406-07 (italics in original).

This Court focuses not on whether allegations are "extravagantly fanciful" but rather whether they "contain any factual allegation sufficient to plausibly suggest" that: a) the Rec & Normal policies were the "moving force" behind, or provided the "direct causal link" to, the YRYP custom, and b) the YRYP custom in turn was the "moving force" behind or provided the "direct causal link" to Feaman's conduct. *Iqbal*, 556 U.S. at 683; *Monell*, 436 U.S. at 694; *Canton*, 489 U.S. at 389.

### i.  Allegations of YRYP

To plead a plausible case of municipal liability based on a custom, White first must allege the "existence of a continuing, widespread, persistent pattern of unconstitutional misconduct" by the City's employees. *Mettler*, 165 F.3d at 1204; *see also Brown*, 520 U.S. at 404.  Because a municipality cannot be liable on a *respondeat superior* theory, "the pattern of unconstitutional conduct must be so pervasive and widespread so as to have the effect and force of law." *Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (internal quotations and citations omitted).

In attempting to allege a pattern, White uses prior incidents of alleged misconduct. Doc. 62, ¶¶ 49-52. The Eighth Circuit has not directly addressed the quantum of "continuing, widespread, persistent" conduct a plaintiff must allege to satisfy the *Iqbal* standard in this context, though it has held that isolated incidents do not suffice and that allegations of "many" incidents do establish liability. *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322-23 (8th Cir. 1986); *Harris v. City of Pagedale*, 821 F.2d 499, 504 (8th Cir. 1987). The Fifth Circuit held that when a plaintiff uses prior incidents to allege a pattern, the prior incidents "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of [the municipality's] employees." *Webster v. Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (*en banc*). In affirming summary judgment on an official policy claim, the Fifth Circuit stated that "[a] pattern requires similarity and specificity[,]" explaining that the prior incidents must point to the specific violation at issue, be sufficiently numerous, and provide context that would show a pattern. *Peterson v. Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009).

Both the Eighth and Fifth Circuit reason that to hold municipalities liable for conduct that does not rise to the level of continuing, widespread frequency would create the *respondeat superior* liability that the Supreme Court repeatedly rejected in §1983 actions. *Brewington*, 902 F.3d at 801; *Peterson*, 588 F.3d at 847-851. In *Pineda v. City of Houston*, cited approvingly by the Eighth Circuit in *Brewington,* the Court held that eleven incidents of police misconduct failed to establish an unconstitutional pattern. 291 F.3d 325, 329 (5th Cir. 2002).

Without determining exactly how many instances or what details would suffice to plausibly plead a pattern of misconduct, the Court finds that White's allegations fail to do so.

White alleges 16 instances of allegedly similar misconduct[3] over a six-year time period, an average of fewer than three instances per year for a police department serving a city with a population, during the relevant time period, of over 319,000, according to the 2010 U.S. Census. U.S. Dep't of Commerce, 2010 Census of Population and Housing (2012); *see also Town of Fletcher v. Hickman*, 165 F. 403, 406 (8th Cir. 1908) (taking judicial notice of the census data for the population of a city); *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) ("While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider . . . items subject to judicial notice, matters of public record . . .").

White fails to plead any facts creating the plausible inference that fewer than three instances per year over a six-year period, in a major metropolitan police department serving a city of over 319,000 residents, constitutes a pattern or practice. Publicly-available data[4] could provide necessary context to evaluate the plausibility of White's allegations. *Friends of Lake View Sch. Dist. Incorporation No. 25 of Phillips Cty. v. Beebe*, 578 F.3d 753, 762 n. 12 (8th Cir. 2009) (considering publicly-available data in deciding plaintiff failed to state a claim upon which relief could be granted). With respect to the six-year period or otherwise, White fails to allege the population of the City, the number of officers on the SLMPD, the number of stops made or encounters involving SLMPD officers, the number of complaints, claims, or lawsuits asserting excessive use of force in similar circumstances, whether or how those complaints, claims, or lawsuits were resolved, or other publicly-available data from which the Court could "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

---

[3] See section IV(A)(2)(d) for the Court's analysis on the similarity of White's allegations of prior incidents.

[4] The U.S. Census Bureau makes its data available on its website (http://factfinder.census.gov) and Missouri's Sunshine Law makes a host of information available to the public. *See* Mo. Rev. Stat. § 610.011.

Contrast White's Complaint with other cases where the plaintiffs did sufficiently allege a widespread practice. For example, in *Simpson v. Ferry*, the district court found that the plaintiff sufficiently pleaded a widespread practice of use of excessive force when the plaintiff included in the complaint statistics as to how many lawsuits were brought against the City of Philadelphia during a five-year period, how much in damages were paid for these lawsuits, and that approximately one-third of the lawsuits included allegations of excessive force. 202 F. Supp. 3d 444, 453 (E.D. Pa. 2016). And, in *Flanagan v. City of Dallas, Texas*, the district court found that the plaintiff sufficiently pleaded a widespread practice of use of excessive force when the plaintiff included in the complaint allegations that Dallas was at the top of the list of police misconduct statistics in the South, the total number of officer-involved shootings, the number of grand juries convened to investigate police misconduct, the number of unarmed individuals killed by Dallas police officers, and the number of open internal affairs investigations into officer-involved shootings. 48 F. Supp. 3d 941, 953 (N.D. Tex. 2014).

*Simpson* and *Flanagan* inform the Court's conclusion that White has not pleaded facts from which the Court can plausibly infer more than the mere possibility of widespread misconduct. Here, the Complaint includes conclusory allegations with no facts to support the conclusions. Ignoring White's conclusory allegations, *Twombly*, 550 U.S. at 555. *Iqbal*, 556 U.S. at 678, the Court finds that White fails to sufficiently plead a custom, pattern, or practice of use of excessive force by SLMPD officers against individuals protesting their arrests; White fails to sufficiently plead the YRYP custom.

### ii. Allegations of Causation

To state a plausible claim for municipal liability under § 1983, White also must plead facts from which the Court can infer that: (1) the Rec & Normal policies were the "moving

force" behind the YRYP custom; and (2) the YRYP custom was the "moving force" behind Feaman's use of force on White. *Monell*, 436 U.S. at 694; *Canton*, 489 U.S. at 389; *see also Brown*, 520 U.S. at 404. As the Supreme Court stated: "our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton,* 489 U.S. at 385. This is a "rigorous standard[] of causation." *Brown*, 520 U.S. at 404-05; *see also Connick v. Thompson*, 563 U.S. 51, 75 (2011) (Scalia, J., concurring).

White pleads no facts from which the Court can infer a direct causal link, instead he resorts only to conclusory allegations that "disentitles them to the presumption of truth[]." *Iqbal*, 556 U.S. at 681. Ignoring those conclusions, as the Court must, White's Complaint lacks any facts from which the Court can infer a "moving force/direct causal link" between the Rec & Normal policies and the alleged YRYP custom. White's Complaint similarly lacks any facts from which the Court could infer a "moving force/direct causal link" between the alleged YRYP custom and Feaman's conduct towards White.

White's underlying resisting arrest case at issue here evidences the implausibility of White's allegations of causation. The City charged White in municipal court with resisting arrest; and White alleges prosecutors attempted to persuade White—and his counsel—to sign a release in exchange for dismissal of his charges. White did not accept a plea bargain or sign a release, he instead chose to exercise his right to go to trial. White had two separate trials—one in municipal court and the other in Circuit Court (on trial *de novo*). *See City of St. Louis v. Jamal White*, Case No. 1822-CR01451.[5] Both courts found White guilty of resisting arrest. These

---

[5] The Court takes judicial notice of these public records. *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012) ("While courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider . . . items subject to judicial notice, matters of public record . . .").

facts undermine White's allegations of causation and further show that White fails to plead that he plausibly is entitled to relief against City under §1983 and *Monell*.

Similarly, White's allegations that Officer Feaman "became enraged at [White] and used deadly force" and "became so enraged, he used his flashlight to strike and *literally* crack [White's] jaw []" further render his allegations of causation by the Rec & Normal policies and the YRYP custom implausible. White pleads that Officer Feaman's rage – not the policies or alleged custom – was the moving force of his contact. *See Brewington,* 902 F. 3d at 802.

### d. Failure to Plead a Pattern or Practice of Misconduct

As explained in section IV(A)(2)(c) above, White's well-pleaded allegations lack facts from which the Court can infer a pattern or practice of misconduct. But even if the Court were to accept all of White's allegations, factual and conclusory, as true, they still fail to establish a plausible claim to relief. White's allegations regarding the 16 instances do not include specifics to plausibly establish a widespread pattern of officers using excessive force against individuals who "protest unlawful arrests." For example, the first instance alleged states:

> SLMPD Officer Marcus Biggins discharged his weapon on two separate occasions then charged the suspect with resisting arrest in violation of Muni Code. 15.10.10 and Defendants' Rec policy required a release of civil rights. The suspect was not a threat. The officer reported there were no injuries.

Doc. 62, pg. 12. This recitation includes no facts to establish excessive use of force, what caused the alleged excessive use of force, that the individual protested an unlawful arrest, that the individual was presented with a release agreement for civil liability, whether the individual signed the release, or whether the officer was ever investigated for his alleged misconduct. White's allegations about the other 15 instances similarly lack facts from which the Court could infer the conclusions White seeks to draw.

In contrast to the multiple instances, in small police departments, involving the specific officers who engaged in the improper conduct in the *Parrish*[6] and *Harris*[7] cases White cites, none of the 16 instances White alleges involves Feaman but instead they involve at least 11 different officers in a police department serving over 319,000 residents.  In short, White's allegations assert that officers used force against individuals, but he does not plead facts plausibly showing a pattern of unlawful use of excessive force.  Put another way, White alleges in conclusory fashion, but "has not 'show[n]'— 'that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (quoting FRCP 8(a)(2)).

White next argues that *Town of Newton v. Rumery*, 480 U.S. 386 (1987), confirms release agreements can suppress, conceal, and establish customs of police misconduct.  The *Rumery* case discusses the enforceability of a release agreement waiving an individual's right to bring a § 1983 suit.  480 U.S. at 392.  Justice Powell, on behalf of a *plurality* of the justices, wrote that in some cases there may be a substantial basis for the concern that release agreements "tempt prosecutors to trump up charges in reaction to a defendant's civil rights claim, suppress evidence of misconduct, and leave unremedied deprivations of constitutional rights."  *Id*. at 394.  Contrary to White's suggestion, the *Rumery* Court did not "confirm that there is a direct connection between improperly obtaining release agreements and establishing customs of police misconduct."  Doc. 99, pg. 7.[8]

---

[6] *Parrish v. Luckie*, 963 F.2d 201 (8th Cir. 1992).

[7] *Harris v. City of Pagedale*, 821 F.2d 499 (8th Cir. 1987).

[8] In White's Memorandum in Opposition to the Motion to Dismiss, he misleadingly quotes *Rumery* when he states: "release agreements tempt prosecutors to trump up charges in reaction to a defendant's civil rights claim, suppress evidence of police misconduct, and leave unremedied deprivations of constitutional rights. We can agree . . ." First, this quote is taken from section III.B of the opinion, which garnered only a plurality of votes and is not the majority opinion. Second, the remainder of the quote expresses the limitations of Justice Powell's statement. The Court quotes the entirety of the paragraph for clarification.

"As we noted above, the Court of Appeals held that all release-dismissal agreements offend public policy because it believed these agreements "tempt prosecutors to trump up charges in reaction to a defendant's civil rights claim, suppress evidence of police misconduct, and leave unremedied deprivations of constitutional rights.  We can

In declining to hold release agreements *per se* unenforceable, the Court in *Rumery* reasoned that "criminal defendants are required to make difficult choices that effectively waive constitutional rights." 480 U.S. at 393 (internal citations omitted). "We see no reason to believe that release-dismissal agreements pose a more coercive choice than other situations we have accepted." *Id*. (internal citations omitted). The Court continued: "In many cases a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action." *Id*. at 394. *Rumery* thus does not raise White's allegations to the level of plausibility.

### e.     Failure to Plead "Moving Force" Allegations

As explained in section IV(A)(2)(c)(ii) above, White's well-pleaded allegations lack facts from which the Court could infer the Rec & Normal policies were the "moving force" behind or had a "direct causal link" with the use of force. But even if the Court were to accept all of White's allegations as true, they still fail to establish a plausible claim to relief.

Using the framework applied in *Iqbal*, the Court finds White fails to allege facts sufficient to state a claim to relief that is plausible on its face because he fails to establish a direct causal link between the policy and Feaman's use of excessive force. White must allege facts to support his contention the Rec & Normal policies were the "moving force" behind the SLMPD's practice of excessive use of force and Feaman's excessive use of force against White. White's Complaint includes many conclusions that the policies caused the use of excessive force by

---

agree that in some cases there may be a substantial basis for this concern. It is true, of course, that § 1983 actions to vindicate civil rights may further significant public interests. But it is important to remember that Rumery had no public duty to institute a § 1983 action merely to further the public's interest in revealing police misconduct. Congress has confined the decision to bring such actions to the injured individuals, not to the public at large. Thus, we hesitate to elevate more diffused public interests above Rumery's considered decision that he would benefit personally from the agreement." *Rumery*, 480 U.S. at 394-95.

SLMPD officers.  But he fails to include specific facts to support those conclusions.  White alleges that: (1) "The Rec & Normal practices and policies caused and concealed a widespread pattern of civil rights abuses throughout the City"; (2) "Together the Rec & Normal practices and policies directly and indirectly[9] motivated SLMPD officers to use excessive force or make false arrests with the protection of the City municipal courts"; and (3) "Today, the Rec & Normal policies and practices have established a tyrannical culture by the SLMPD throughout the City." Doc. 62, ¶¶ 24, 26, 27.  Accepting these conclusory allegations as true, they do not provide facts from which the Court could plausibly conclude that either the Rec & Normal policies caused the YRYP custom or that the YRYP custom caused Feaman's conduct towards White.

### f.    Obvious Alternative Explanations

In determining the plausibility of a plaintiff's claim, *Iqbal* and *Twombly* instruct the Court to consider whether "obvious alternative explanations" exist for the allegedly unconstitutional conduct.  *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567.  The Court must then determine whether the plaintiff plausibly alleges a violation of the law.  *Id*.

Common sense and experience show that many "obvious alternative explanation[s]" exist for implementation of the Rec & Normal policies other than to conceal civil rights abuses.  For example, as White himself acknowledges in his Complaint, the Rec & Normal policies may be driven by municipal economics.  Doc. 62, ¶ 30 (City's consultant "opined that the Rec policy was an excellent method in protecting the City from lawsuits . . .").  Prosecuting cases (resisting arrest or otherwise) in municipal court rather than circuit court may result in the City, rather than the State, receiving any fines imposed.  *See* Mo. Rev. Stat. § 479.080 (fines and costs for violations of municipal ordinances are deposited into the municipal treasury); Mo. Rev. Stat. §

---

[9] Because *Monell*, *Canton*, and their progeny require a "direct causal link," the Court chooses not to consider White's allegation of "indirect" motivation. *Iqbal*, 556 U.S. at 682; *Brown*, 520 U.S. at 403.

478.434 (fines imposed in circuit court for misdemeanors are deposited into the city treasury); Mo. Const. Art. 9, § 7 (fines paid for a breach of a state penal law are paid to school funds and distributed to the schools of various counties).  Likewise, requiring a civil liability release as a condition of a plea bargain reduces the City's economic exposure and use of resources, including resources to defend cases.  Other plausible explanations exist for both the Rec & Normal policies, such as achieving efficiency in processing a high volume of municipal-court cases.  The Court finds that White's allegations fall short of what would be required to establish, at the pleading stage, plausibility.

In this case, the Court also has to determine whether on the facts pleaded, "obvious alternative explanations" exist for Feaman's conduct.  In *Twombly*, the Court examined obvious alternative explanations for the defendants' conduct in not competing with one another, and in *Iqbal* the Court examined obvious alternative explanations for both the conduct alleged (arrests of Arab Muslims) and the motivation for the arrests (whether or not it was the "purposeful invidious discrimination respondent ask[ed] the Court] to infer[.]").  550 U.S. at 567-68; 556 U.S. at 682.  Here, the Court examines whether obvious alternative explanations exist for Feaman's conduct (the alleged excessive use of force) and for the "moving force" causing the conduct.  *Id*.  White specifically pleads the cause of Feaman's excessive use of force, *i.e.*, Feaman became "enraged."  *See Brewington,* 902 F. 3d at 802.  Moreover, even assuming no "obvious alternative explanations" exist for Feaman's conduct, the Court would nonetheless dismiss the Complaint as to the City, Isom and Feaman (in their official capacities)[10] for failure to state a claim, as explained in sections IV(A)(2)(c)-(e), above.

---

[10] White's claims against Feaman in his individual capacity remain pending.

### B.    Failure to Train

Municipal Defendants assert that White failed to plausibly allege a failure-to-train claim against the City.  Specifically, Municipal Defendants argue White fails to allege that a failure to train or supervise directly caused Feaman to use excessive force against White.  Municipal Defendants also claim White failed to allege any particular omission in the City's training program sufficient to cause, *i.e.*, be the "moving force" behind, the City's employees' violation of citizens' constitutional rights.

To state a claim for supervisory liability under § 1983 for a failure to train or supervise, White must plead: (1) notice of a pattern of unconstitutional acts committed by subordinates; (2) deliberate indifference to or tacit authorization of those acts; (3) failure to take sufficient remedial action; and (4) proximate cause of the plaintiff's injury.  *Livers v. Shenck*, 700 F.3d 340, 355 (8th Cir. 2012).  A failure to train may serve as the basis for § 1983 liability where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Canton*, 489 U.S. at 388.  A court analyzes a claim for failure to supervise the same way it analyzes a claim for failure to train.  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013).

When governmental policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the governmental entity may be deemed deliberately indifferent if the policymakers choose to retain that program.  *Brown,* 520 U.S. at 407.  The governmental entity's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the [governmental entity] itself to violate the Constitution.'"  *Connick*, 563 U.S. at 60 (quoting *Harris,* 489 U.S at 395 (O'Connor, J. concurring in part and dissenting in part)).  "A

pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62.

White alleges four areas in which the City failed to train Feaman: (1) the proper use of firearms, (2) the use of department-issued firearms and weapons on unarmed law-abiding citizens, (3) to stop using force to limit the amount of harm caused when no threat to the officer or others exists, and (4) to not use deadly force on a citizen when no danger to the life of the officer or others exists. White does not include any facts to support his conclusion that the City failed to train Feaman in these areas. White also fails to allege any facts as to what the SLMPD training program includes or does not include. Without facts about the training Feaman did, or did not receive, White fails to sufficiently plead that a failure to train caused the constitutional violation. As currently pleaded, White's Complaint assumes because Feaman allegedly committed a constitutional violation, Feaman must not have been trained properly. But assuming, as the Court must, that Feaman used excessive force against White, not every instance of excessive use of force establishes deliberate indifference by the City. *Connick,* 563 U.S. at 62. White must plead facts specific to the SLMPD's training program.

Further, for the same reasons that White's 16 instances of purportedly similar conduct fail to establish a pattern or practice of use of excessive force, those instances also fail to establish a pattern of constitutional violations of which policy-making officials can be charged with knowledge of a failure to train their employees. *Canton*, 489 U.S. at 390. For these reasons, White fails to sufficiently plead a claim of failure to train against the City, and consequently, against Isom in his official capacity.

### C.    Redundant Claims

Finally, Municipal Defendants argue White's official-capacity claims against Feaman and Isom are redundant of the claims against the City.  The Court need not address this argument because it dismisses the claims against the City, Feaman, and Isom in their official capacities, for the reasons stated above.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Plaintiff's Complaint [93] is **GRANTED**.  The Court dismisses all claims against the City, the claim against Dan Isom in his official capacity, and the claim against Adam Feaman, in his official capacity.

So Ordered this 14th day of November, 2019.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**